# IN THE UNITED STATES DISTRICT COURT FOR THE
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| | ) NO. 3:19-cr-00293 |
| v. | ) |
| | ) JUDGE CAMPBELL |
| | ) |
| JEREMY CART | ) |

## MEMORANDUM AND ORDER

### I. Introduction

Pending before the Court are Defendant's Motion to Suppress Evidence Obtained as a Result of the Illegal Stop of the Defendant on July 20, 2019 (Doc. No. 17), and the Government's Response (Doc. No. 18). Through the Motion, Defendant challenges a traffic stop that occurred on July 20, 2019, and seeks to suppress all evidence seized as a result of the stop. The Court held a hearing on the Motion on June 25, 2020, and the parties filed post-hearing briefs (Doc. Nos. 28, 29). For the reasons stated below, the Motion to Suppress (Doc. No. 17) is **DENIED.**

### II. Evidence Adduced at the Hearing

At the hearing on the Motion, the Government called Michael Peeler, who is currently Superintendent of John S. Wilder Youth Development Center. (Doc. No. 27, at 8-9). At the time of the stop, Mr. Peeler was a deputy with the Cheatham County Sheriff's Department, and had been working in that position for approximately two years. (*Id.,* at 9-10). On July 20, 2019, at approximately 7:20 a.m., Mr. Peeler was on patrol in northwest Cheatham County, and had pulled onto the shoulder of Highway 12 North, facing northbound. (*Id.,* at 11-12, 24). Mr. Peeler testified

he was sorting warrants while monitoring traffic, when his radar alerted him to an approaching vehicle. (*Id.,* at 12). Mr. Peeler initially noticed the vehicle failing to maintain its lane, appearing to travel southbound in the northbound lane. (*Id.*, at 12, 24). The vehicle, a black Ford F150, veered back into its own southbound lane, and then veered off the side of the road once or twice, coming close to a guardrail. (*Id.,* at 12-13, 25). Based on these observations, Mr. Peeler testified, he believed the driver was violating the requirement that he maintain his lane, and suspected he was guilty of distracted driving or driving under the influence. (*Id.,* at 13).

As the vehicle approached, Mr. Peeler activated his blue lights to alert the driver, and after the vehicle passed, Mr. Peeler turned into the southbound lane to follow it. (*Id.,* at 13-14, 25-26). The vehicle slightly veered off the road one or two more times before stopping about a quarter of a mile later at a lumberyard. (*Id.,* at 14, 27). Mr. Peeler said those "veers" could have been an attempt to pull over, and when they occurred, he had already decided to pull Defendant over based on his earlier observations. (*Id.,* at 27-28). At that point, Mr. Peeler made contact with Defendant. (*Id.*)

According to Mr. Peeler, he told Defendant that he stopped him because he noticed him veering off the road or failing to maintain his lane. (*Id.,* at 15). Defendant told Mr. Peeler he was on the phone, and did not deny he failed to maintain his lane. (*Id.,* at 32). Mr. Peeler testified that Defendant appeared to be visibly intoxicated based on his demeanor, slurred speech, and confusion. (*Id.*) Mr. Peeler administered field sobriety tests, on which he said Defendant performed very poorly. (*Id.,* at 16-17). At some point during the stop, Mr. Peeler called his shift supervisor and told him he stopped Defendant because he failed to maintain his lane and was possibly driving under the influence. (*Id.,* at 30-31). A search of Defendant's truck revealed weapons, containers

2

of alcohol, and other items. (*Id.,* at 32-33). Mr. Peeler arrested Defendant and transported him to jail. (*Id.,* at 17). A blood alcohol test administered several hours later found Defendant's BAC to be 0.073. (*Id.,* at 19-20).

Mr. Peeler testified that both his dashboard camera and his body camera recorded footage that day. The dashboard camera is activated when the blue lights are activated and pre-records events occurring 30 seconds before activation. (*Id.,* at 21). The camera is mounted on the roof of the patrol car, to the left of the passenger side sun visor. (*Id.,* at 22). The camera is angled differently from the vantage point of the driver. (*Id.*) The dash cam footage was entered as Government's Exhibit 3 and relevant portions were played at the hearing. (*Id.,* at 24). Mr. Peeler testified his body camera is also activated when the blue lights are activated. (*Id.,* at 28). Unlike the dashboard camera, the body camera records sound. (*Id.*) Mr. Peeler was not asked if the body cam pre-records events occurring before it is activated. The body cam footage was entered as Government's Exhibit 4 and relevant portions were played at the hearing. (*Id.,* at 29).

On cross examination, Mr. Peeler testified he was sorting warrants for "a couple of minutes" before he observed Defendant's vehicle. (*Id.,* at 35, 37). Mr. Peeler also testified the guard rail on Highway 12 was about two feet off the roadway. (*Id.,* at 39-40). According to Mr. Peeler, the legal blood alcohol content cutoff in Tennessee is 0.08. (*Id.,* at 41).

### III. <u>Analysis</u>

A traffic stop is a "seizure" within the meaning of the Fourth Amendment, and if the stop is illegal, evidence obtained as a result of the stop must ordinarily be suppressed. *See, e.g., United States v. Macklin*, No. 19-6462, 2020 WL 4049751, at *3 (6th Cir. July 20, 2020). An officer must have "probable cause" to stop a vehicle for a civil infraction, and "reasonable suspicion" of an

3

ongoing crime to stop for a criminal violation. *Id.; see also United States v. Jones,* 953 F.3d 433, 437 (6th Cir. 2020) (holding that reasonable suspicion of a completed misdemeanor may, in some circumstances, justify an investigatory stop).

The Government argues Deputy Peeler had probable cause to stop Defendant's vehicle for a violation of Tennessee Code Annotated Section 55-8-123(1), and had reasonable suspicion to stop Defendant to investigate whether he was driving under the influence, in violation of Tennessee Code Annotated Section 55-10-401. Section 55-8-123(1) provides:

> Whenever any roadway has been divided into two (2) or more clearly marked lanes for traffic, the following rules, in addition to all others consistent with this section, shall apply:
>
> (1) A vehicle shall be driven as nearly as practicable entirely within a single lane and shall not be moved from that lane until the driver has first ascertained that the movement can be made with safety. . .

Section 55-10-401 prohibits driving while under the influence of any intoxicant, or when the blood alcohol level is 0.08% or more.

"Probable cause" is a reasonable ground for belief that an offense has been committed, supported by less than prima facie proof but more than mere suspicion. *See, e.g., Macklin, supra; United States v. Collazo*, 818 F.3d 247, 254 (6th Cir. 2016). Probable cause does not require an actual finding of a violation, but rather a probability or substantial chance of criminal activity. *Id.* Probable cause determinations are "fact-dependent and will turn on what the officer knew at the time he made the stop." *United States v. Hughes*, 606 F.3d 311, 316 (6th Cir. 2010); *United States v. Valdez*, 147 Fed. Appx. 591, 594 (6th Cir. Sept. 26, 2005). Reasonable suspicion is "a particularized and objective basis for suspecting the particular person of criminal activity."

4

*Collazo,* 818 F.3d at 257). The court looks to the "totality of the circumstances" when the stop commenced in making that assessment. *United States v. Young,* 707 F.3d 598, 603 (6th Cir. 2012).

Having observed Mr. Peeler testify, and having reviewed the footage of the dashboard camera and body camera, the Court concludes that the stop was supported by both probable cause of a traffic violation, and reasonable suspicion of driving under the influence. Mr. Peeler testified that he observed Defendant's vehicle veer into the northbound lane of the two-lane road, then veer back into its own lane before veering off the other side toward the guard rail. Either observation supports a reasonable ground for believing Defendant violated the requirement of Section 55-8-123(1) that a vehicle stay within its own lane.[1] This evidence also supports reasonable suspicion to believe Defendant was driving under the influence of an intoxicant in violation of Section 55-10-401.[2]

The Court also credits Mr. Peeler's testimony because that testimony is corroborated by statements made at the time. Shortly after stopping Defendant, Mr. Peeler told him he did so because Defendant failed to maintain his lane. Mr. Peeler also called and advised his supervisor that he stopped Defendant for failing to maintain his lane and possibly driving under the influence.

---

[1] Unlike the cases cited by Defendant, Defendant's forays out of his lane of traffic were not so isolated and brief that probable cause supporting a violation of Section 55-8-123 was absent. *See United States v. Sanchez,* 2018 WL 5262080, at *3 (W.D. Tenn. July 11, 2018) (concluding officer did not have probable cause to make a stop for violation of Section 55-8-123 because the defendant's lane excursion was isolated and brief); *United States v. Freeman*, 209 F.3d 464, 466 (6th Cir. 2000) (concluding officer did not have probable cause to effect a stop for violation of Section 55-8-123 because there was only one "isolated incident of a large motor home partially weaving into the emergency lane for a few feet and an instant in time.")

[2] The Court is not relying on Mr. Peeler's testimony about observations he made while following Defendant after initiating the stop.

Mr. Peeler's testimony is also corroborated by Defendant's own reaction. Defendant did not deny he failed to maintain his lane; he merely offered the explanation that he was on the phone.

Defendant argues the video footage contradicts Mr. Peeler's testimony, and undermines his credibility. Defendant points to Mr. Peeler's testimony that he was sorting through warrants for "a couple of minutes" before the radar tone alerted him to Defendant's vehicle. According to Defendant, this testimony is contradicted by video footage showing Mr. Peeler pulling over onto the shoulder of the road for roughly 15 seconds before Defendant's vehicle comes into view. Defendant is correct that Mr. Peeler appears to have overestimated the time he spent sorting through warrants before noticing Defendant's vehicle, but the Court is not persuaded the contradiction undermines his testimony about what he observed.

Defendant also argues the video footage contradicts Mr. Peeler's testimony that Defendant veered into the northbound lane. According to Defendant, Mr. Peeler could not have observed Defendant's vehicle veering into the northbound lane because that was not recorded on the dash cam footage. Defendant also contends the body cam footage reveals Mr. Peeler beginning his pursuit approximately four seconds after the radar tone sounded. At that point, the dash cam footage reveals the veering Mr. Peeler testified about would have already occurred.

The Court is not persuaded, however, that the video footage undermines Mr. Peeler's testimony. First, as Mr. Peeler testified, the dash cam footage does not mirror the observations of the driver given the angle of the camera is not the same as the view of the driver. Also, the camera footage does not account for any lag time (beyond 30 seconds) between the officer's observations and the beginning of recording. As for Defendant's argument that the pursuit began four seconds after the radar tone, Defendant assumes the first radar tone heard on the body cam footage is the

6

first tone that alerted Mr. Peeler, rather than the first tone *recorded*.³ Indeed, if the body cam began recording when the blue lights were activated (with no pre-recording), it is unlikely the first tone recorded was the first tone that alerted Mr. Peeler to an oncoming vehicle. Mr. Peeler's pursuit begins within seconds after the start of the body cam recording. For these reasons, Defendant's arguments based on the video footage are unavailing.

## IV. Conclusion

For the reasons set forth above, the Court concludes that Defendant's challenge to the traffic stop is without merit, and his request to suppress evidence is denied.

It is so **ORDERED**.

*[signature]*
WILLIAM L. CAMPBELL, JR.
UNITED STATES DISTRICT JUDGE

---

³ Mr. Peeler was not asked whether the tone repeated itself or whether the tone heard on the recording was the first tone he heard.